FILED
2026 MAY 21 10:07 AM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 26-2-16754-1 SEA

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR THE COUNTY OF KING

MATTHEW WILDMAN, on his own behalf
and on behalf of others similarly situated,

Plaintiff,

vs.

PHILADELPHIA INQUIRER, LLC,

Defendant.

Case No: _____ SEA

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

Plaintiff Matthew Wildman, on his own behalf and on behalf of others similarly situated, on information and belief except to his own experiences and matters of public record, complains of Philadelphia Inquirer, LLC ("Defendant," or "The Inquirer"), as follows:

## I.      INTRODUCTION

1.      In 1998, to protect Washington consumers from the annoyance and harassment caused by the burgeoning spam email industry, the Washington State Legislature enacted the Commercial Electronic Mail Act (CEMA), codified at chapter 190 of title 19 of the Revised Code of Washington (RCW).

2.      Among other things, CEMA prohibits transmitting a commercial email with "false or misleading information in the subject line" to the email address of a Washington resident.

CLASS ACTION COMPLAINT – 1

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

RCW 19.190.020(1)(b).

3. Defendant engages in the precise activity which CEMA prohibits.

4. The Inquirer spams Washington consumers, including Plaintiff, with commercial emails featuring subject lines which employ various tactics to create a false sense of urgency in consumers' minds—and ultimately, from consumers' wallets.

5. This false urgency wastes consumers' time by enticing them to engage with the defendant's marketing efforts for fear of missing out. It also floods consumers' email inboxes with repeated false notifications that the time to act—*i.e.*, *purchase*—is short.

6. Through this deceptive time-sensitivity, The Inquirer falsely narrows the field—steering consumers away from shopping for better deals—to its own products that must be purchased *now*.

7. Plaintiff challenges The Inquirer's harassment of Washington consumers with deceptive marketing for violations of CEMA and the Consumer Protection Act (RCW 19.86.020) for injuries caused, additionally seeking injunctive relief against such violations in the future.

## II.   JURISDICTION AND VENUE

8. The Court has jurisdiction of this case under RCW 2.08.010.

9. Venue is proper in King County under RCW 4.12.020(3) because Plaintiff's cause of action, or some part thereof, arose in King County.

## III.   PARTIES

10. Plaintiff Matthew Wildman is a resident of King County, Washington.

11. Defendant Philadelphia Inquirer, LLC, is a Delaware company with its principal address at 100 S. Independence Mall W., Floor 6, Philadelphia, PA 19106-2320.

12. Defendant offers its products in Washington through its website and through digital

CLASS ACTION COMPLAINT – 2

**STRAUSS BORRELLI PLLC**
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

and print subscriptions to its newspaper; it is thus subject to personal jurisdiction in this Court. *See, e.g.*, *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351 (2021).

## IV.    FACTUAL ALLEGATIONS

### A.    CEMA protects Washington consumers from deceptive spam emails.

13.    The Supreme Court of Washington has made clear: "[A]ll Internet users … bear the cost of deceptive spam." *State v. Heckel*, 143 Wn. 2d 824, 835 (2001) (en banc).

14.    In 1998, the Legislature found that the "volume of commercial electronic mail" was "growing," generating an "increasing number of consumer complaints." Laws of 1998, ch. 149, § 1.

15.    While it's been nearly three decades since CEMA's enactment, the problems caused by unsolicited commercial email, *i.e.* spam email, have grown exponentially.

16.    The problems, however, are not limited to email content. Subject lines of emails are framed to attract consumers' attention away from the spam barrage to a message that entices consumers to click and, ultimately, *purchase*.

17.    In 2003, the United States Congress found that "[m]any senders of unsolicited commercial electronic mail purposefully include misleading information in the messages' subject lines in order to induce the recipients to view the messages." 15 U.S.C. § 7701(a)(8).

18.    In 2012, one study estimated that Americans bear "costs of almost $20 billion annually" due to unsolicited commercial email. Justin M. Rao & David H. Reiley, *The Economics of Spam*, 26 J. of Econ. Perspectives 87, 88 (2012).

19.    Even when bulk commercial email marketers are operating under color of consumer consent, the reality is that "[m]ost privacy consent"—especially under the "notice-and-choice" approach predominant in the United States—"is a fiction." Daniel J. Solove, *Murky Consent: An*

CLASS ACTION COMPLAINT – 3

**STRAUSS BORRELLI PLLC**
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

*Approach to the Fictions of Consent in Privacy Law*, 104 Boston Univ. L. Rev. 593, 596 (2024).

20.    Consumers therefore routinely "consent" to receive flurries of commercial emails which they did not meaningfully request and in which they have no genuine interest.

21.    This includes emails sent to consumers from businesses with which they have no prior relationship—by virtue of commercial data brokers and commercial data sharing agreements.

22.    Simply conducting the routine affairs of daily life often exposes consumers to unanticipated and unwanted volumes of commercial email. "Nowadays, you need an email address for everything from opening a bank account to getting your dog's nails trimmed, and … [o]nce you hand over your email address, companies often use it as an all-access pass to your inbox: Think of shopping websites that send account updates, deals, 'we miss you' messages, and holiday promotions throughout the year. It's too much." Kaitlyn Wells, *Email Unsubscribe Services Don't Really Work*, N.Y. Times Wirecutter (Aug. 19, 2024), https://perma.cc/U8S6-R8RU/.

23.    The Legislature presciently intended CEMA to "provide some immediate relief" for these problems by prohibiting among other things commercial emails that "contain untrue or misleading information in the subject line." Laws of 1998, ch. 149, § 1.

24.    CEMA thereby protects Washington consumers against the "harms resulting from deceptive commercial e-mails," which "resemble the type of harms remedied by nuisance or fraud actions." *Harbers v. Eddie Bauer, LLC*, 415 F. Supp. 3d 999, 1008 (W.D. Wash. 2019).

25.    CEMA's "truthfulness requirements" increase the costs of sending deceptive commercial emails and thereby reduce their volume. *Heckel*, 143 Wn. 2d at 836.

26.    CEMA's "truthfulness requirements" thereby advance the statute's aim of protecting consumers "from the problems associated with commercial bulk e-mail" while facilitating commerce "by eliminating fraud and deception." *Id.*

CLASS ACTION COMPLAINT – 4

**STRAUSS BORRELLI PLLC**
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

27.    CEMA "mean[s] exactly what it says": in "broad" but "patently clear" language, CEMA unambiguously prohibits "sending Washington residents commercial e-mails that contain *any* false or misleading information in the subject lines of such e-mails." *Certification from U.S. Dist. Ct. for W. Dist. of Wash. in Brown v. Old Navy, LLC*, 567 P.3d 38, 44, 46–47 (Wash. 2025).

28.    CEMA's protections do not depend on whether an email was (really or fictively) solicited by consumers, nor on whether consumers relied on any false or misleading statement contained in its subject line. *See Harbers*, 415 F. Supp. 3d at 1011.

29.    The statute's only concern is to suppress false or misleading information in the subject line of commercial emails. *See Brown*, 567 P.3d at 44–45.

**B.    The subject lines of The Inquirer's marketing emails make false time scarcity claims.**

30.    One common way online marketers "manipulate consumer choice by inducing false beliefs" is to create a false sense of urgency or to falsely claim that consumers' time to act is scarce. Fed. Trade Comm'n, *Bringing Dark Patterns to Light* 4 (2022), https://perma.cc/847M-EY69/; *see also* U.K. Competition & Mkts. Auth., *Online Choice Architecture—How Digital Design Can Harm Competition and Consumers* 26 (2022), https://perma.cc/V848-7TVV/.

31.    The FTC has identified the "False Limited Time Message" as one example of false time scarcity claims, in which the marketer creates "pressure to buy immediately by saying the offer is good only for a limited time or that the deal ends soon—but without a deadline or with a meaningless deadline that just resets when reached." *Bringing Dark Patterns to Light*, *supra* para. 30, at 22.

32.    "False or misleading scarcity claims can change the behavior of consumers." *Online Choice Architecture*, *supra* para. 30, at 27.

CLASS ACTION COMPLAINT – 5

**STRAUSS BORRELLI PLLC**
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

33. Representations about the timing and duration of sales, discounts, and other special offers are fundamentally representations about prices, and such representations matter to ordinary consumers. *See, e.g.*, Huiliang Zhao *et al.*, *Impact of Pricing and Product Information on Consumer Buying Behavior with Customer Satisfaction in a Mediating Role*, 12 Frontiers in Psychology 720151 (2021), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC8710754/pdf/fpsyg-12-720151.pdf/.

34. False scarcity claims are psychologically effective. As "considerable evidence" suggests, "consumers react to scarcity and divert their attention to information where they might miss opportunities." *Online Choice Architecture*, *supra* para. 30, at 26.

35. Invoking this time pressure achieves a seller's aim to narrow the field of competitive products and deals, by "induc[ing] consumers to rely on heuristics (mental shortcuts), like limiting focus to a restricted set of attributes or deciding based on habit." *Id.*

36. Under time pressure, "consumers might take up an offer to minimize the uncertainty of passing it up." *Id.*

37. False time scarcity claims thus *harm consumers* by manipulatively distorting their decision-making to *their detriment—and the seller's benefit*.

38. Indeed, one 2019 study found that "customers who took timed deals rather than waiting to see wider options ended up worse off than those who waited." *Id.* at 27.

39. False time scarcity claims also harm market competition. Consumers learn to ignore scarcity claims, "meaning that when a product [or offer] is truly scarce, the seller will not be able to credibly communicate this information." *Id.*

40. These false time scarcity claims are a staple of The Inquirer's marketing scheme to compel consumers to purchase its products.

CLASS ACTION COMPLAINT – 6

**STRAUSS BORRELLI PLLC**
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

41.    The Inquirer is a nationally distributed daily newspaper, based in Philadelphia, Pennsylvania, that offers newspaper subscriptions in print format and digital format via its website, inquirer.com.

42.    To advertise and encourage subscriptions, The Inquirer routinely sends spam emails to consumers. These emails are part of a calculated marketing strategy that Defendant orchestrates in advance to maximize sales by distorting factual information about the duration and availability of its promotions.

43.    **Urgent Spam Emails.** Unfortunately for those recipients, The Inquirer regularly sends its emails with urgent subject headings that do not reflect the true availability of the advertised deal. This strategy is demonstrated in the examples discussed below.

44.    Defendant has tailored its approach to fit a number of offers, including promotion extensions. In these examples, The Inquirer sends consumers marketing emails to advertise an offer, promotion, or sale. Then, it uses the subject lines of follow-up emails to present the promotional pricing as a scarce or time-limited opportunity. This strategy commands consumers' attention and pressures them to purchase. Finally, once the originally advertised "deadline" has passed, The Inquirer knowingly extends the promotion to a new end date.

45.    This misleading marketing strategy allows The Inquirer to maximize sales during both the initial promotion and the subsequent "extension." While The Inquirer may present these extensions as though they are a favor or unexpected blessing to consumers, they are anything but. By deploying false time pressure with surprise extensions—which are only disclosed once the original promotion has ended—The Inquirer urges consumers to purchase quickly while withholding the time consumers need to make informed buying decisions. A 2023 Labor Day sale provides an apt example of this strategy at work.

CLASS ACTION COMPLAINT – 7

**STRAUSS BORRELLI PLLC**
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

46.     First, The Inquirer sends consumers marketing emails advertising a new promotion. For its Labor Day 2023 sale, it started its email marketing as early as August 22, when it sent an email with the subject line, " 👍 Labor Day Sale: 10¢/WEEK for 4 MONTHS."

47.     Throughout late August and into early September 2023, the Inquirer continued to prime consumers about this "10¢ a week for 4 months" Labor Day Sale with spam emails, including one on August 31, 2023 with the subject line: "🏖 Work is hard. This is EASY: Just 10¢!"

48.     For the next step in its scheme, The Inquirer uses the subject lines of its follow-up emails to impose false time pressure on recipients. Such subject lines urge consumers to purchase from The Inquirer's website by falsely warning them that the offer is coming to an end.

49.     That time pressure came on Labor Day itself, September 4, 2023 when The Inquirer clogged consumers' inboxes with an email purportedly reminding them, in the subject heading, of this advertised end to the sale: " 🎉 Happy Labor Day! Sale ends today!". This urgent deadline—amplified by emoji and exclamation marks—was reinforced by text in the body of the email, telling consumers to "act fast" and that this was their "LAST CALL" to take advantage of the "10¢ a week for 4 months" Labor Day Sale.

50.     The subject line of the September 4, 2023 email was false or misleading.

51.     Labor Day was not the final opportunity to obtain the Labor Day deal. The next day, September 5, after Labor Day had come and gone, the Inquirer sent another email with the headline: " ⏰ SALE EXTENDED: Just 10¢ a week!"

52.     The September 5, 2023 email confirms the misleading nature of The Inquirer's misstatement on September 4 that the 10¢ deal would "end[ ] today." The Labor Day Sale didn't end on September 4. Put another way, the Labor Day deal did not end on its namesake day.

53.     The Inquirer redeployed this ruse that very same month, yet again pairing a false

CLASS ACTION COMPLAINT – 8

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

deadline with a surprise "extension."

54.    On September 18, 2023, The Inquirer announced a deal on subscriptions in a marketing email sent to consumers that urged them, with firework emojis in the subject line, to be expeditious or lose out: " 💥 ACT NOW: 25¢/MONTH for 6 MONTHS 💥 ".

55.    The very next day, September 19, 2023, following the urgent call to action, The Inquirer spammed consumers with an email conveying, in the subject heading, the imminent expiration to this  25¢ subscription deal: " 🚨 ENDING: 25¢/MONTH for 6 MONTHS 🚨 ".

56.    The subject line of the September 19, 2023 email was false or misleading.

57.    The urgent representation, in caps, that the deal is presently "ending" misleads consumers that time is *immediately* running out. The body of the email reinforced this deceptive messaging, stating, in bolded font: "**Time left on this sale? Not much.**"

58.    But there was more time before the purportedly "ending" 25¢ subscription deal would actually end. On September 20, 2023, The Inquirer sent another spam email to consumers, informing them, in the subject line, that there was a whole other day to take advantage of the deal: " 🔥 25¢/MONTH FOR 6 MONTHS: TODAY ONLY 🔥 ." As the email further made clear: this next-day "today only" offer was effectively a post-deadline extension, telling consumers to "Consider this overtime."

59.    The Inquirer continued its misleading representations about deal deadlines in 2024. It started off the year with "flash sales" designed to capture consumers' attention.

60.    For example, on January 23, 2024, The Inquirer spammed consumers with an email that announced in the subject heading: " ⚡ FLASH SALE: $1/WEEK for 1 YEAR ⚡ ".

61.    The subject line of the January 23, 2024 email was false or misleading.

62.    The subject line conveyed that, just like a lightning bolt ( ⚡ ), the $1 per week deal

CLASS ACTION COMPLAINT – 9

**STRAUSS BORRELLI PLLC**
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

would be gone in the same *flash* it had appeared in. It made this representation knowing—as it stated in the body of this email—that the deal would be available for "48 hours."

63.     Then, on January 24, 2024, The Inquirer sent an email to consumers urgently conveying, in the subject line: " 🔴 $1/WEEK for 1 YEAR ends today! 🔴 ", strategically invoking road signs to get consumers to stop and take notice of the "today" deadline for the $1 per week deal. The body of the email reinforced the "today" deadline, calling it the "LAST CHANCE," and emphasizing that "This sale is slipping away."

64.     The subject line of the January 24, 2024 email was false or misleading.

65.     January 24 was not the deadline. On January 25, 2024, The Inquirer spammed consumers with another email, saying, in the subject line: " 🚨 SALE EXTENDED: $1/WEEK for 1 YEAR 🚨 ", confirming in the body of the email that, in fact, January 25—not January 24—was the "Last chance!" to take advantage of the promotion.

66.     One month later, The Inquirer re-upped this "flash sale" variation on its false deal deadline theme, with an email on February 20, 2024, announcing, in the subject heading: " ⚡ 25¢ A MONTH for 6 MONTHS ⚡ FLASH SALE".

67.     The subject line of the February 20, 2024 email was false or misleading.

68.     Again, the "flash sale" marketing, supported by lightning bolt emoji and nearly all-caps formatting, falsely conveyed the message that the promotion would be gone in a flash.

69.     Right on The Inquirer's usual schedule, the very next day, February 21, 2024, it spammed consumers with an email flagging down consumers, in the subject heading, to emphasize the purportedly imminent deadline on the 25¢ deal: " 🚩 [24 HOURS LEFT] 25¢ a month for 6 months 🚩 ". The email itself reinforced this alleged deadline with the bolded message: "**Time left**

CLASS ACTION COMPLAINT – 10

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

**on this sale? Not much.”**

70.     The subject line of the February 21, 2024 email was false or misleading.

71.     Again as before, The Inquirer sent an email on February 22 informing consumers, in the subject line: “[SALE EXTENDED] 🚨 25¢ A MONTH for 6 MONTHS!”, giving the lie to the February 21 representation that there were just “24 HOURS LEFT” on the deal.

72.     Another example of this deal deadline deception came in March 2024.

73.     On March 12, 2024, The Inquirer spammed consumers with an email putting consumers on the clock with a subject heading saying: “ ⏰ ENDING NOW: $1 for 6 months ⏰ ”, further urging consumers in the body of the email that “there’s not much time left on this sale!” and telling them this was their “LAST CHANCE.”

74.     The subject line of the March 12, 2024 email was false or misleading.

75.     The deal did not “end now” (*i.e.* that same day), as The Inquirer made clear in a next-day marketing email on March 13, saying in the subject line: “ ❗ SALE EXTENDED: $1 for 6 months ❗ ”.  In fact, as it told consumers in that email, March 13 was the true “FINAL CALL” for the $1 deal, not March 12.

76.     And again, in July 2024, The Inquirer re-deployed this misleading time scarcity messaging, sending an email on July 16, 2024 to consumers with the subject heading: “ ⌛ TODAY ONLY: $1 FOR 6 MONTHS”, using the hourglass emoji to emphasize that time on the $1 deal would soon run out.

77.     The subject line of the July 16, 2024 email was false or misleading.

78.     The $1 deal would survive another day, as announced in the subject line of an email the next day, July 17, purportedly “extending” the “TODAY ONLY” deal: “ 📍 SALE EXTENDED: $1 for 6 MONTHS”.

CLASS ACTION COMPLAINT – 11

**STRAUSS BORRELLI PLLC**
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

79.     In a 2025 reprise of The Inquirer's familiar scheme, it spammed consumers with an email on July 10, 2025 urgently telling them, in the subject line, that this was their "Last Chance: 99% OFF 6 MONTHS", offering a 6-month subscription for $1.

80.     The subject line of the July 10, 2025 email was false or misleading.

81.     July 10th was not the "last chance." On July 11, 2025, the Inquirer purported to offer a deal extension in an email, saying in the subject heading: "SALE EXTENDED: $1 for 6 MONTHS."

82.     As these examples demonstrate, The Inquirer is engaged in a scheme by which it pressures consumers to purchase products from its website using subject lines which falsely represent the availability of its offers.

**C.      The Inquirer knows when it sends emails to Washington residents.**

83.     A sophisticated commercial enterprise, like The Inquirer, which is engaged in persistent marketing through mass email campaigns across the United States, has several ways of knowing where the recipients of its marketing emails are located. The means it employs are peculiarly within its knowledge.

84.     First, the sheer volume of email marketing that The Inquirer engages in puts it on notice that Washington residents would receive its emails.

85.     Second, The Inquirer may obtain location information tied to email addresses when consumers make purchases through its digital platforms or otherwise self-report such information to the Inquirer.

86.     Third, The Inquirer may obtain location information tied to email addresses by tracking the IP addresses of devices used to open Inquirer emails, which in turn can be correlated to physical location (as illustrated, for example, by the website https://whatismyipaddress.com/).

CLASS ACTION COMPLAINT – 12

**STRAUSS BORRELLI PLLC**
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

87.     Specifically, The Inquirer appears to use Salesforce Marketing Cloud to manage its email marketing campaigns, which allows The Inquirer to collect and track detailed data about the behavior of its email recipients, including open and click-through rates,[1] as well as "geographical data."[2]

88.     Fourth, The Inquirer may obtain location information tied to email addresses by purchasing consumer data from commercial data brokers such as Acxiom, Oracle, and Equifax, which sell access to databases linking email addresses to physical locations, among other identifiers.

89.     Fifth, The Inquirer may obtain location information tied to email addresses by using "identity resolution" services offered by companies such as LiveRamp, which can connect consumers' email addresses to their physical locations, among other identifiers.

90.     Sixth, The Inquirer may obtain information that the recipients of its marketing emails are Washington residents because that information is available, upon request, from the registrant of the Internet domain names contained in the recipients' email addresses. *See* RCW 19.190.020(2).

91.     It is thus highly probable that a seller of Defendant's size and sophistication employs not just one but several means of tying consumers' email addresses to their physical locations, at least at the state level.

**D.     The Inquirer violated Plaintiff's right under CEMA to be free from deceptive commercial emails.**

92.     The Inquirer has spammed Plaintiff with commercial emails whose subject lines

---

[1] *See* Salesforce, *Tracking in Email Studio*, https://help.salesforce.com/s/articleView?id=mktg.mc_es_tracking_overview.htm&type=5 (last accessed May 19, 2026).
[2] Salesforce, *What Is Email Tracking?*, https://www.salesforce.com/marketing/email/tracking/?bc=OTH (last accessed May 19, 2026).

CLASS ACTION COMPLAINT – 13

contain false or misleading statements in violation of his right to be free from such annoyance and harassment under CEMA.

93.    Plaintiff has received emails as part of marketing scheme described *supra*, ¶¶, including the following emails from The Inquirer:

94.    An email sent on September 4, 2023 titled " 🎉 Happy Labor Day! Sale ends today!" described above at ¶¶ 46-52.

95.    An email sent on September 19, 2023 titled " 🚨 ENDING: 25¢/MONTH for 6 MONTHS 🚨 " described above at ¶¶ 53-58.

96.    An email sent on January 23, 2024 titled " ⚡ FLASH SALE: $1/WEEK for 1 YEAR ⚡ " described above at ¶¶ 60-65.

97.    An email sent on January 24, 2024 titled " 🔴 $1/WEEK for 1 YEAR ends today! 🔴 " described above at ¶¶ 63-65.

98.    An email sent on February 20, 2024 titled " ⚡ 25¢ A MONTH for 6 MONTHS ⚡ FLASH SALE" described above at ¶¶ 66-71.

99.    An email sent on February 21, 2024 titled " 🚩 [24 HOURS LEFT] 25¢ a month for 6 months 🚩 " described above at ¶¶ 69-71.

100.    An email sent on March 12, 2024 titled " ⏰ ENDING NOW: $1 for 6 months ⏰ " described above at ¶¶ 73-75.

101.    An email sent on July 16, 2024 titled " ⏳ TODAY ONLY: $1 FOR 6 MONTHS" described above at ¶¶ 76-78.

102.    An email sent on July 10, 2025 titled "Last Chance: 99% OFF 6 MONTHS"

CLASS ACTION COMPLAINT – 14

described above at ¶¶ 79-81.

103.    The subject lines of these emails are false or misleading in violation of CEMA.

104.    The subject lines contained false statements of fact as to the "duration or availability of a promotion." *Brown*, 567 P.3d at 47.

## V.    CLASS ALLEGATIONS

105.    Plaintiff brings this action under Civil Rule 23 on behalf of the following putative class ("Class"):

> All Washington residents who, during the Class Period, received a commercial email sent by the Defendant, on behalf of the Defendant, or with the Defendant's assistance, that contained messaging in the email subject line which misrepresented the facts of a sale, deal or promotion.

106.    Excluded from this definition of the Class are Defendant's officers, directors, and employees; Defendant's parents, subsidiaries, affiliates, and any entity in which Defendant has a controlling interest; undersigned counsel for Plaintiff; and all judges and court staff to whom this action may be assigned, as well as their immediate family members.

107.    The Class Period extends from the date four years before this Class Action Complaint is filed to the date a class certification order is entered in this action.

108.    Plaintiff reserves the right to amend the Class definition as discovery reveals additional emails containing false or misleading information in the subject line that Defendant sent or caused to be sent during the Class Period to email addresses held by Washington residents.

109.    The Class is so numerous that joinder of all members is impracticable because the Class is estimated to minimally contain thousands of members.

110.    There are questions of law or fact common to the class, including without limitation whether Defendant sent commercial emails containing false or misleading information in the subject line; whether Defendant sent such emails to email addresses it knew or had to reason to

CLASS ACTION COMPLAINT – 15

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

know were held by Washington residents; whether Defendant's conduct violated CEMA; whether Defendant's violation of CEMA constituted a *per se* violation of the CPA; and whether Defendant should be enjoined from such conduct.

111.    Plaintiff's claims are typical of the Class's because, among other reasons, Plaintiff and Class members share the same statutory rights under CEMA and the CPA, which Defendant violated in the same way by the uniform false or misleading marketing messages it sent to all putative members.

112.    Plaintiff will fairly and adequately protect the Class's interests because, among other reasons, Plaintiff shares the Class's interest in avoiding unlawful false or misleading marketing; has no interest adverse to the Class; and has retained competent counsel extensively experienced in consumer protection and class action litigation.

113.    Defendant has acted on grounds generally applicable to the Class, in that, among other ways, it engaged in the uniform conduct of sending uniform commercial emails to Plaintiff and the Class, which violate CEMA and the CPA in the same way, and from which it may be enjoined as to Plaintiff and all Class members, thereby making appropriate final injunctive relief with respect to the Class as a whole.

114.    The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, in that, among other ways, Defendant has violated their rights under the same laws by the same conduct, and the only matters for individual determination are the number of false or misleading emails received by each Class member and that Class member's resulting damages.

115.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy because, among other reasons, the claims at issue may be too small

CLASS ACTION COMPLAINT – 16

STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

to justify individual litigation and management of this action as a class presents no special difficulties.

## VI.    CLAIMS TO RELIEF

### First Claim to Relief

### Violation of the Commercial Electronic Mail Act, RCW 19.190.020

116.    Plaintiff incorporates and realleges paragraphs 1 – 104 above.

117.    CEMA provides that "[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message … to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that … [c]ontains false or misleading information in the subject line." RCW 19.190.020(1)(b).

118.    Defendant is a "person" within the meaning of CEMA. RCW 19.190.010(11).

119.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transition of "commercial electronic mail messages" within the meaning of CEMA. RCW 19.190.010(2).

120.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendant knew, or had reason to know, were held by Washington residents, including because Defendant knew that Plaintiff and putative members were Washington residents because that "information is available, upon request, from the registrant of the internet domain name contained in the recipient's electronic mail address." RCW 19.190.020(b)(2).

121.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages that contained false or misleading

CLASS ACTION COMPLAINT – 17

**STRAUSS BORRELLI PLLC**
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

122.    For Defendant's violation of CEMA, Plaintiff is entitled to all available relief, including an injunction against further violations.

**Second Claim to Relief**

**Violation of the Consumer Protection Act, RCW 19.86.020**

123.    Plaintiff incorporates and realleges paragraphs 1 – 104 above.

124.    The CPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." RCW 19.86.020.

125.    A violation of CEMA is a *per se* violation of the CPA. RCW 19.190.030.

126.    A violation of CEMA establishes all the elements necessary to bring a private action under the CPA. *Wright v. Lyft*, 189 Wn. 2d 718 (2017).

127.    CEMA provides that "[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message … to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that … [c]ontains false or misleading information in the subject line." RCW 19.190.020(1)(b).

128.    Defendant is a "person" within the meaning of CEMA. RCW 19.190.010(11).

129.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transition of "commercial electronic mail messages" within the meaning of CEMA. RCW 19.190.010(2).

130.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that

CLASS ACTION COMPLAINT – 18

**STRAUSS BORRELLI PLLC**
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

Defendant knew, or had reason to know, were held by Washington residents.

131.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

132.    For Defendant's violation of the CPA, Plaintiff and putative members are entitled to an injunction against further violations; the greater of Plaintiff's actual damages or liquidated damages of $500 per violation, trebled; and costs of the suit, including a reasonable attorney's fee.

## VII.   JURY DEMAND

133.    Plaintiff will demand a jury trial by separate document in accordance with Local Civil Rule 38(b).

## VIII.   PRAYER FOR RELIEF

Plaintiff asks that the Court:

A.      Certify the proposed Class, appoint Plaintiff as Class representative, and appoint undersigned counsel as Class counsel;

B.      Enter a judgment in Plaintiff's and the Class's favor permanently enjoining Defendant from the unlawful conduct alleged;

C.      Enter a judgment in Plaintiff's and the Class's favor awarding actual or liquidated damages, trebled, according to proof;

D.      Award Plaintiff costs of suit, including reasonable attorneys' fees; and

E.      Order such further relief the Court finds appropriate.

*[Counsel signatures to follow on next page.]*

CLASS ACTION COMPLAINT – 19

**STRAUSS BORRELLI PLLC**
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

Date:  May 21, 2026

Respectfully submitted,

*/s/ Samuel J. Strauss*

Samuel J. Strauss, WSBA No. #46971
Raina C. Borrelli*
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
sam@straussborrelli.com
raina@straussborrelli.com

Lynn A. Toops*
Natalie A. Lyons*
Ian R. Bensberg*
**COHENMALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ltoops@cohenmalad.com
nlyons@cohenmalad.com
ibensberg@cohenmalad.com

Gerard J. Stranch, IV*
Michael C. Tackeff*
Andrew K. Murray*
**STRANCH, JENNINGS &
GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
gstranch@stranchlaw.com
mtackeff@stranchlaw.com
amurray@stranchlaw.com

*Counsel for Plaintiff and the Putative Class*

**\* Applications for admission
*pro hac vice* forthcoming**

CLASS ACTION COMPLAINT – 20